**ECOLOCHEM, INC., Plaintiff,**

v.

**MOBILE WATER TECHNOLOGY CO.,\* Defendant.**

**No. LR–C–85–834.**

United States District Court,
E.D. Arkansas, W.D.

June 30, 1988.

---

\* During the course of the trial defendant moved the court to substitute Mobile Water Technology Co. for the original named defendant, Memphis Mobile Water Technology Co. The court granted the motion from the bench. Fed.R.Civ.P. 25.

Clifton E. McCann, Richard L. Aitken, Lane & Aitken, Washington, D.C., Thomas B. Staley, Robinson, Staley & Marshall, Little Rock, Ark., for plaintiff.

John R. Walker, III, Larry W. McKenzie, Walker & McKenzie, Memphis, Tenn., N.M. Norton, Jr., Wright, Lindsey & Jennings, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

HENLEY, Senior Circuit Judge, Sitting by Designation.

This is an action brought by Ecolochem, Inc., a Virginia corporation, against Memphis Mobile Water Technology Co., an Arkansas corporation, to recover for Mobile Water's alleged infringement of Ecolochem's United States Patent No. 4,556,492 ('492 Patent). 35 U.S.C. § 271. Mobile Water stipulated that it has infringed several claims of the '492 Patent if it is valid. Mobile Water has asserted as its defense to Ecolochem's action that the '492 Patent is invalid. This court has original jurisdiction of this action pursuant to 28 U.S.C. § 1338(a). Further, this court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are diverse and the amount in controversy exceeds $10,000.00.

At the parties' request, the court has ordered separate trials on the issues of Mobile Water's defense of invalidity and damages. *See* Fed.R.Civ.P. 42(b). The issue of invalidity has been tried to the court,[1] and this memorandum incorporates the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52.

## I. THE INVENTION.

The '492 Patent is for a process to remove dissolved oxygen ($O_2$) from water.[2] Water that is exposed to air becomes satu-

---

1. The Honorable J. Smith Henley, United States Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

2. Water generally contains varying amounts of dissolved molecular oxygen. This is the oxygen that, in rivers and streams, fish breathe by use of gills.

rated with oxygen containing concentrations measured in parts per million. The removal of this dissolved oxygen is important to the electric power generating industry because the dissolved oxygen in the water used to run the generating turbines and circulated throughout the system promotes corrosion in the system. It is also important that other contaminants (such as the minerals found in hard water) not be introduced into the system as they will also have a deleterious effect. As early as 1955 dissolved oxygen concentrations as low as five parts per billion were recommended.

In the day-to-day operation of the power plant the feedwater is typically deoxygenated by a deaerating feedwater heater. This device, however, requires the use of steam which must be drawn off the system. Consequently, when the plant is initially starting up, or is restarting after a shutdown for maintenance, some other method of deoxygenating the feedwater is necessary. Ecolochem's process, which is the subject of the '492 Patent, was introduced to meet this need.

The '492 Patent is a combination of several well known processes. The first step is the addition of hydrazine ($N_2H_4$) to the water to be deoxygenated. The hydrazine reacts with the dissolved oxygen to yield water and nitrogen gas. Because this reaction does not proceed quickly at low temperatures, the '492 Patent includes a second step of passing the water and hydrazine through a bed of activated carbon. The activated carbon catalyzes the hydrazine-oxygen reaction allowing it to proceed quickly at low temperatures. This two-step process was well known in the literature. See Houghton & Cuerdon, The Use of Active Carbon with Hydrazine in the Treatment of Boiler Feed Water, International Water Conference, Bournemouth, England pp. 54–58 (1957) (Def. Ex. 16) (throughout the record the parties refer to these first two steps of the '492 Patent as the Houghton process).

The inventors of the '492 Patent, Ecolochem employees, analyzed the effluent from the Houghton process and determined that impurities were introduced by the process. Further analysis revealed a variety of ionic contaminants which the inventors concluded leached from the activated carbon.[3] Ecolochem experimented with a mixed bed ion exchange resin[4] downstream from the Houghton process in an effort to remove the ionic contaminants. The addition of the mixed bed resin achieved the desired result of removing the ionic contaminants. Ecolochem then tested the process on a larger commercial scale and decided to implement the process for commercial use. The entire apparatus was designed to be installed on a semi tractor-trailer so the process would be mobile and could be transported between cities as Ecolochem's deoxygenation services were needed.[5]

Ecolochem first used the process commercially in the summer of 1983, under a secrecy agreement, at Southern California Edison's San Onofre nuclear generating facility. Southern California Edison was very pleased with the quality of water supplied by Ecolochem's process, and it proved

---

**3.** These ionic salts which leached into the effluent were calcium, magnesium, bicarbonate, sodium, silica, sulfate, chloride and potassium. The concentration at which these contaminants were present in the effluent from the Houghton process was unacceptable in the power industry as some could lead to corrosion. Silica was particularly undesirable as it would build up on the turbine blades and quickly reduce their efficiency.

**4.** A mixed bed resin is a resin column with the ability to exchange either positive ions (cations) or negative ions (anions). Thus, when the effluent from the Houghton process passes through the mixed bed resin, any positive ions (such as calcium ($Ca+$)) will remain on the resin and a hydrogen ion ($H+$) will be released into the water. Likewise, negatively charged ions are exchanged on the resin for hydroxyl ($-OH$) ion. The hydrogen and hydroxyl ions thus released may then combine to form water. The net result is to remove ionic impurities in exchange for water.

**5.** It was also necessary to periodically regenerate the mixed bed ion exchange resin when, after a large volume of water was deoxygenated, the hydrogen and hydroxyl ions originally present on the resin would be replaced by the ionic contaminants. The mobile nature of the system allowed for periodic returns to Ecolochem's plant to regenerate the resin.

to be both commercially feasible and profitable.

On December 16, 1983, the inventors filed a patent application on the deoxygenation process. After being initially rejected, the '492 Patent was awarded on December 1, 1985.

Mobile Water has commercially marketed a deoxygenation process which it admits infringes claims one through six, eight, nine, fifteen and sixteen of the '492 Patent. Ecolochem commenced this suit to enjoin the infringement and recover damages for past infringement. Mobile Water defends its activity, alleging the '492 Patent is invalid on the basis of anticipation and obviousness.

## II. THE VALIDITY OF THE '492 PATENT.

Ecolochem enjoys a presumption of validity in its patent. 35 U.S.C. § 282. The burden of proving invalidity rests on the challenger, Mobile Water, and that burden is one of clear and convincing evidence. *Id.; Medtronic, Inc. v. Intermedics, Inc.,* 799 F.2d 734, 741 (Fed.Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). In determining whether the challenger has met its burden, it is not the duty of this court to assume the role of "Super Patent Examiner" and determine whether the judge personally thinks the invention should or should not have been patented. Markey, *On Simplifying Patent Trials,* 116 F.R.D. 369, 375–76 (1987). Rather, it is the court's obligation to determine whether Mobile Water has carried its burden of clear and convincing proof of invalidity either by anticipation or obviousness.

**A. ANTICIPATION.** A patent is invalid if "the invention was ... described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent...." 35 U.S.C. § 102(a). Appearance in a prior publication is termed anticipation. "Anticipation requires the disclosure in a single prior art reference of each element of the claim under consideration." *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1554 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Mobile Water points to three prior art references as being anticipatory. The court will discuss each seriatim.

*1. The Martinola Article.* In an article aimed at promoting a deoxygenation process utilizing hydrogen gas and palladium as a catalyst, deoxygenation with hydrazine was discussed in a section devoted to cost comparison of three methods of deoxygenation. Martinola, et al., "Saving Energy by Catalytic Reduction of Oxygen in Feedwater" in *Proceedings 41st International Water Conference, Engineering Society of Western Pennsylvania,* 77–83 (1980) (Def. Ex. No. 45). The Martinola article states, "When applying activated carbon as a catalyst in the removal of oxygen with hydrazine at ambient temperatures it has to be taken into account that the carbon releases salts into the demineralized water." *Id.* at 81. On the following page the authors diagram several applications including the following:

*Id.* at 82.

Mobile Water argues that this diagram refers back to the prior discussion of carbon catalyzed hydrazine deoxygenation. Thus, every aspect of the '492 Patent would be anticipated because it includes the passage of the effluent from the carbon catalyst through a mixed bed resin to remove ionic impurities. The court concludes otherwise.

The diagram found on page 82 of the Martinola article is under the bold-faced heading "Application of oxygen reduction in water with *hydrogen.*" *Id.* at 81 (em-

phasis supplied). Thus, the diagram refers to applications of the process the authors are trying to promote—the palladium/hydrogen catalysis—and not the hydrazine process which is discussed in a separate section. This conclusion is buttressed by the fact that the palladium/hydrogen process may also release ionic impurities into the effluent, *see id.* at 79 ("traces of chlorides or other ions may be released"), thus necessitating a downstream ion exchange resin when high purity deoxygenated water is required.[6] Nothing in the Martinola reference expressly teaches the use of a mixed bed ion exchange resin following the hydrazine/carbon process. Accordingly, the court finds that the Martinola article is not anticipatory. *See Akzo N.V. v. U.S. International Trade Commission,* 808 F.2d 1471, 1479 (Fed.Cir.1986) (anticipation is a question of fact), *cert. denied,* —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987).

*2. The Bechtel Publication.* Mobile Water also argues that a tome put out by the Bechtel Group in 1982 anticipates the claims of the '492 Patent. Bechtel Group, Inc., *Guide to the Design of Secondary Systems and Their Components to Minimize Oxygen Induced Corrosion* (1982) (Def. Ex. No. 4). Unremarkably, the Bechtel publication discloses the well-known process of catalyzing the oxygen-hydrazine reaction with activated carbon. *Id.* at 4–18 & 4–29. Thus, the inquiry is whether the publication teaches that mixed bed ion exchange should follow the carbon catalyzed reaction to remove ionic impurities leached from the activated carbon. The Bechtel publication does recommend testing if activated carbon is utilized as a catalyst because some contaminants may be released due to leaching. *Id.* at 4–30. No reference is made, however, to the nature of the contaminants or how they should be removed.

The Bechtel publication does refer to the use of ion-exchange resins in the secondary system of the power generating plant. *Id.* at 4–24. The discussion at this point, how-

ever, is concerned with the effect such ion-exchanges would have on hydrazine levels in the system, and not the removal of contaminants released by the activated carbon. The court finds that the Bechtel publication does not anticipate the '492 Patent.

*3. The Russian Reference.* The final writing Mobile Water alleges to be anticipatory is one authored by two Russian scientists. Akol'zin & Kostrikira, *Catalytic Oxidation of Hydrazine with Atmospheric Oxygen Dissolved in Water,* UDC 546.-171.5 (Woolcott & Co., Patent Translation Services) (Def. Ex. No. 9). The Russian article recognized the use of activated carbon to catalyze the hydrazine-oxygen reaction. *Id.* at 10. The article also discussed the use of an ion exchanger following the activated carbon. *Id.* at 10–11. The court finds this reference not to anticipate the '492 Patent for two reasons.

First, the ion exchanger is referred to only as AV–17. Ecolochem's expert testified that he believed that this referred to an anion exchange resin. Mobile Water's expert was unable to give an opinion whether the AV–17 came within the scope of the '492 Patent. It should be recalled that the '492 Patent called for a mixed bed resin consisting of both anion and cation exchange resins.

Second, Akol'zin's paper does not describe whether ionic contaminants are leached from the activated carbon. Thus, it is unclear why Akol'zin included the AV–17 ion exchange resin downstream from the activated carbon catalyst. The article certainly does not teach the use of a mixed bed resin to remove ionic impurities introduced by leaching from the activated carbon.

In sum, the court finds that none of the three references cited by Mobile Water anticipates all the elements of any claim of the '492 Patent. Thus, the court turns to Mobile Water's other affirmative defense—obviousness.

---

**6.** The diagram discussed is for water that will be used as make-up-water for boilers, cooling water for generators, and water for nuclear reactors. *Id.* at 82. All these applications require water that is not only deoxygenated to very low levels, but is also free from ionic contaminants.

**B. OBVIOUSNESS—FACTUAL INQUIRIES.** A patent is invalid

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. The ultimate question of obviousness is one of law based on a series of factual inquiries. *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.,* 807 F.2d 955, 958 (Fed.Cir.1986). The court's factual inquiry encompasses four areas:

> (1) the scope and content of the prior art;
>
> (2) the difference between the prior art and the claims at stake;
>
> (3) the level of ordinary skill in the art; and
>
> (4) objective evidence of nonobviousness (secondary factors).

*Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966); *Akzo N.V.,* 808 F.2d at 1480.

**1. The Prior Art.** In evaluating the prior art, the infringer "cannot pick and choose among individual parts of assorted prior art references 'as a mosaic to recreate a facsimile of the claimed invention.'" *Akzo N.V.,* 808 F.2d at 1481 (quoting *W.L. Gore & Associates, Inc.,* 721 F.2d at 1552). Many patented inventions consist of the assemblage of existing well known elements in new and different ways. Accordingly, simply because each element is known and unpatentable in isolation, it does not necessarily follow that the combination of these elements is unpatentable. *See Environmental Designs, Ltd. v. Union Oil Co. of California,* 713 F.2d 693, 698 (Fed.Cir.1983) ("Virtually all inventions are combinations and virtually all combinations are of old elements"), *cert. denied,*

464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). The inquiry is whether "there is something in the prior art as a whole *to suggest* the desirability, and thus the obviousness, of making the combination" of old elements. *Custom Accessories, Inc.,* 807 F.2d at 959 (quotation omitted) (emphasis in original).

As discussed in the prior section on anticipation, both the Martinola article and the Bechtel publication recognize the potential of the Houghton process and caution that the use of activated carbon may release impurities into the effluent. Neither reference endeavors to analyze the nature of the impurities nor discuss how such impurities may be removed. Ecolochem's expert testified that the prior art revealed that some forms of activated carbon may be expected to give off ionic contaminants. *See, e.g.,* J.W. Hassler, *Purification with Activated Carbon* 51 (1974) ("In general, the use of the ion-exchanger should follow the treatment with carbon, especially if the carbon contains any appreciable amount of soluble inorganic compounds") (Def. Ex. No. 15).

The prior art also describes the use of ion exchange resins to remove dissolved ionic contaminants in water.

**2. The Differences Between the Prior Art and the Claims at Issue.** Ecolochem readily concedes that each individual component or process in the '492 Patent is well recognized in the prior art. Ecolochem also recognizes that prior art references teach combinations of two of the three, *see supra* pp. 779–80, major components of the '492 Patent.[7] The difference between the prior art and the claims in the '492 Patent is the combination of the separate components in a single embodiment.

**3. Level of Ordinary Skill in the Art at the Time of the Invention.** The art

---

**7.** The Houghton article, the Martinola article, the Bechtel Publication and the Russian reference all teach the combination of the first two steps of the process patented in the '492 Patent. The Hassler book teaches the use of ion exchange following activited carbon. Combination of an activated carbon filter followed by ion exchange has also been recognized. U.S. Patent No. 3,985,648 (Pl. Ex. No. 46); *Deminer-* *alization Brings Down Cost of Pharmaceutical Manufacturing,* Culligan Job Report No. 151 (Def. Ex. No. 20) (In both of these references the activated carbon serves to remove organic contaminants and protect the downstream ion exchange resins. The activated carbon is not used as a catalyst for some other reaction as in the '492 Patent).

to which the '492 Patent relates is water treatment and purification.

Factors that may be considered in determining level of skill include: type of problems encountered in art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.

*Custom Accessories, Inc.*, 807 F.2d at 962; *Environmental Designs, Ltd.*, 713 F.2d at 696. Determining the ordinary level of skill is critical to the question of obviousness because it provides the platform from which to view the patented invention in its relation to the prior art.

Ecolochem's expert was unable to precisely characterize the level of skill, but generally opined that it was unsatisfactory and in need of improvement.

Mobile Water's expert characterized the level of skill in the art to be high. By high, the expert referred to the level of education possessed by persons in the art. He characterized this level of education to be at least a high school education and typically "a couple of years of college"; many would have scientific degrees and several years experience.

Frank Craft, the president of Mobile Water, considered the level of skill in the art to be high and stated that he possessed the level of ordinary skill in the art. Mr. Craft has several years of college majoring in economics, has attended some seminars, and has some practical experience in the art.

The court finds that the skill in the art is scattered among different levels. There exists a core of individuals with a high level of formal scientific education who keep abreast of developments in the art. The level of *ordinary* skill in the art is more modest. In particular, the person of ordinary skill does not possess a broad knowledge of developments in the art. Both the inventors of the '492 Patent and Mr. Craft became aware of the Houghton process by happenstance. Likewise, the experts (presumably persons who would be included among the most highly skilled in the art) who were called at trial were unaware of the Houghton process until retained by the parties in connection with this litigation.

■ Nonetheless, whether the mythical person of ordinary skill in the art[8] would have knowledge of the Houghton article and other prior art references is irrelevant. The person of ordinary skill is presumed to have such knowledge. *Custom Accessories, Inc.*, 807 F.2d at 962. Thus, the inquiry is what the person of ordinary skill "would have been able to do when in possession of the prior art...." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985). At the same time, a person of ordinary skill is not presumed to have the spark of inventiveness which is what distinguishes inventors from those of ordinary skill. "A person of ordinary skill in the art ... thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights...." *Id.* at 454. As a guide to what Mr. Phosita is likely to accomplish with his presumed knowledge of the prior art, the court also inquires into objective evidence of nonobviousness.

■ *4. Objective Evidence of Nonobviousness.* The Supreme Court has suggested that some secondary considerations may have relevance as indicia of obviousness or nonobviousness. These secondary factors include "commercial success, long felt but unsolved needs [and] failure of others...." *Graham*, 383 U.S. at 17, 86 S.Ct. at 694.

The court finds, based on the evidence adduced at trial, that at the time of the invention there existed a long-felt but unsolved need for a deoxygenation process that resulted in very low dissolved oxygen concentrations without adding impurities

---

8. This mythical being, incidentally, possesses a surname—Mr. Phosita (Person Having Ordinary Skill In The Art). *Kimberly–Clark Corp. v. John-* *son & Johnson,* 745 F.2d 1437, 1454 n. 5 (Fed. Cir.1984).

and that operated at low temperatures. As early as 1949 the British Iron and Steel Research Association recommended that oxygen content in boiler feedwater be below 15 to 70 ppb, depending on the boiler operating pressure. Ellis, Boiler Feedwater Treatment and Oxygen Scavengers, Chemical & Process Engineering, March, 1955 at 79, 80. (Pl.Ex. No. 12.) This need for deoxygenated boiler and feedwater continued into the 1970's, Babcock & Wilcox Co., *Steam/Its Generation and Use,* 34–14, 34–19 & 34–25 (1972) (recommending dissolved oxygen levels of seven ppb) (Def. Ex. No. 19), and continued into the 1980's when the patented invention was discovered. *See* Bechtel Group Inc., *Guide to the Design of Secondary Systems and Their Components to Minimize Oxygen–Induced Corrosion* 1–3 (1982) (Def. Ex. No. 4). During the normal operation of the plants the industry was able to reduce the dissolved oxygen to these low levels by means of a deaerating condensor. The condensor, however, required steam from the operating plant. Accordingly, when the plant's operating load dropped below 40% or during initial startups and startups after periodic maintenance, the deaerating condensor was ineffective.

Several processes (vacuum degasifiers and sodium sulfite anion exchange) were introduced to attempt to meet the need for deoxygenated water in circumstances where deaerating condensors could not be used. These processes all had drawbacks. Vacuum degasifiers required considerable maintenance and large capital outlays. *See* Martinola, *supra,* at 81 (Def. Ex. No. 45). The sulfite process yielded water of inconsistent quality and could cause difficulties if the sodium sulfite was introduced into the boiler. Bechtel Group, Inc., *supra,* at 4–2 (Def. Ex. No. 4). Other processes were also being actively investigated. *See* Martinola, *supra* at 77–83 (Palladium catalyzed reaction) (Def. Ex. No. 45).

Mobile Water argues that the need in the industry did not arise until 1982 when the Electric Power Research Institute (EPRI) published its guidelines. EPRI, *PWR Secondary Water Chemistry Guidelines* (Oct. 1982) (Def. Ex. No. 1). There is no indication, however, that EPRI's guidelines had any coercive or mandatory effect on the industry. Indeed, the guidelines simply recognize a concern in the industry which has existed at least since the 1950's.

Ecolochem also achieved substantial commercial success with the patented process. *See* Pl. Ex. No. 84. In 1982 Ecolochem only offered the sulfite process and had $200,000.00 in revenues. The hydrazine process was offered in 1983 on a limited basis with sales of about $500,000.00 while the sulfite process generated revenues of $400,000.00. For the following three years the hydrazine process sales jumped dramatically to approximately $2,000,000.00 a year while the sulfite process averaged less than $300,000.00. In 1987 Ecolochem's hydrazine process dropped to about $1,000,000.00. This drop, however, was at least in part the result of other companies, including Mobile Water, using the '492 Patent process.

Mobile Water claims that the increased revenues were due to Ecolochem's advertising campaign and a rush in the industry to follow the 1982 EPRI guidelines. The court has found that the need existed and was recognized by the industry well before the EPRI guidelines were published. Further, it seems unlikely that an industry would be swayed by advertising to spend millions of dollars on deoxygenation unless that service was needed and the process offered was superior to others on the market. These were not spur of the moment purchases based solely on advertising gloss. The advertising alerted the industry to the product, but the product had to sell itself to the buyers.

*C. OBVIOUSNESS—LEGAL CONCLUSION.* The ultimate inquiry for the court is whether the subject of the '492 Patent would have been obvious, at the time of the invention, to a person having ordinary skill in the art. 35 U.S.C. § 103. This person of ordinary skill is presumed to be aware of relevant prior art references. The challenger, Mobile Water, bears the burden of proof on whether the '492 Patent is invalid for obviousness. 35 U.S.C. § 282.

In expounding on the power of the lever Archimedes said, "Give me a firm place to stand and I will move the earth." Pappus Alexander, *Collectio.* In assessing the question of obviousness, the scope of the prior art is akin to the lever. Archimedes' "firm place" on which to stand corresponds to the ordinary skill in the art on which Mr. Phosita (Person Having Ordinary Skill In The Art) stands. With the knowledge of these two factors, one is able to gauge whether Archimedes indeed could have moved the earth, or, in this case, whether Mr. Phosita would have found the '492 Patent to be obvious. For example, if the lever is too short (the scope of the prior art limited) or the place on which to stand too close to the earth or lacking firmness (ordinary skill in the art very low), Archimedes would be unable to move the earth.

Here, the court has been able to gauge the length of the lever and finds it sufficient for the task. However, rather than having found a firm place on which to stand, the court has been pointed to a quagmire.

The parties offered testimony which generally went to the educational level of the person ordinarily skilled in the art. The level of educational attainment was given by Mobile Water's expert as between a high school graduate and a holder of an advanced degree. Very little could be gleaned as to what was the ordinary level of education in the art. Ecolochem's expert testified that he was unable to state an opinion as to the ordinary level of skill, but that the educational achievement was too low. As noted earlier, Mobile Water's President testified he had the ordinary level of skill and his post-high school formal education consisted of two years of college majoring in economics. Ultimately, Mobile Water's experts testified that the ordinary level of skill was "high." The court is unable to give much evidentiary significance to such a generic standard.

Mobile Water offered no evidence on the factors other than education bearing on the ordinary level of skill in the art. *See Cus-tom Accessories, Inc.,* 807 F.2d at 962. The court therefore concludes that Mobile Water failed to meet its burden of proof on the defense of obviousness of the '492 Patent.[9]

### III.  CONCLUSION.

The court finds that the '492 Patent was not anticipated by any prior art references introduced at trial. The court also finds that Mobile Water failed to meet its burden of proof on the defense of obviousness. As Mobile Water has failed to carry its burden to establish invalidity and has admitted infringement, defendant is hereby enjoined from infringing on plaintiff's United States Patent No. 4,556,492. 35 U.S.C. § 283. An appeal may be taken as provided for by law. *See* 28 U.S.C. § 1292; *Schulner v. Jack Eckerd Corp.,* 706 F.2d 1113, 1114 (11th Cir.1983) ("granting of an injunction is appealable as an interlocutory order even though the trial court may have reserved its determination of remaining issues, such as compensatory damages"). The issue of damages still remains. The court shall withhold entry of final judgment until such time as the issue of damages, previously bifurcated by order of the court from the invalidity defense, shall be tried. An appropriate order will be entered.

---

9. Despite the failure of proof on the primary factors, the court finds that the secondary factors impel a conclusion that the '492 Patent was not obvious.