**ECOLOCHEM, INC., Plaintiff,**

v.

**SOUTHERN CALIFORNIA EDISON COMPANY, Defendant.**

**No. CV 92–3436 RG (JGX).**

United States District Court,
C.D. California.

Sept. 1, 1994.

---

Lane, Aitken & McCann, Clifton E. McCann, Andrew C. Aitken, David D'Zurilla, Washington, DC, Bonne, Bridges, Mueller, O'Keefe & Nichols, Peter R. Osinoff, Los Angeles, CA, for plaintiff.

Gregory P. Stone, Ted G. Dane, Munger, Tolles & Olson, Los Angeles, CA, Russell C. Swartz, Douglas Ditonto, Law Dept., Southern California Edison Co., Rosemead, CA, for defendant Southern California Edison Co.

### Memorandum and Order Regarding Edison's Motions for Summary Judgment

GADBOIS, District Judge.

In June 1992, Ecolochem, Inc. ("Ecolochem") sued Southern California Edison Company ("Edison") for patent infringement. Edison moved for partial summary judgment, arguing that it does not infringe as a matter of law, and that some of Ecolochem's claims are anticipated by, or obvious in light of, a prior publication.[1]

## I. Background

### A. Ecolochem's Patents.

Ecolochem owns U.S. Patents No. 4,556,-492 ('492 Patent) and No. 4,818,411 ('411 Patent). These patents describe similar deoxygenation processes which include:

adding hydrazine [N2H4] to a liquid containing dissolved oxygen [02], passing the liquid through a bed of activated carbon to catalyze a reaction between the dissolved oxygen and hydrazine [N2H4 + 02 –> 2H20 + N2] whereby carbon contaminants are added to the liquid, and removing the contaminants. In another embodiment, unreacted hydrazine that remains in the liquid following the catalysis is removed by passing the liquid through an ion exchange resin.

'492 Patent Abstract. Figure 1 illustrates the three main steps of this process.

1.

*Glossary of Essential Terms*

Ion: In solutions, an electrically charged atom or group of atoms.
Anion: An ion having a negative charge.
Cation: An ion having a positive charge.
Cation Exchange Resin: A resin which, when brought in contact with liquid containing cation contaminants, removes them.

Mixed Bed: A mixture of strong acid cation and strong base anion resins. A mixed bed resin removes both cationic and anionic carbon contaminants from liquids with which it comes in contact.
Stoichiometric: Involving substances that are in the exact proportions required for a given reaction.

STEP 1:
Hydrazine (N2H4)
added to Liquid
Containing
Dissolved Oxygen
(O2).

STEP 2:
Catalysis of O2 –
N2H4 Reaction with
Activated Carbon.
Carbon Contaminants
Added; Excess
Hydrazine Remains.

STEP 3:
Removal of
Dissolved Carbon
Contaminants and
Excess Hydrazine
with Mixed Bed or
Cation Exchange
Resin.

**FIGURE 1:**
**ONE PREFERRED EMBODIMENT OF**
**THE CLAIMED INVENTION**

The patents acknowledge that step 1, the use of hydrazine to eliminate oxygen, is not in and of itself new—"[i]n prior art deoxygenation processes, hydrazine has been used as a strong reducing agent to prevent corrosion and other problems associated with oxygenated water." '411 patent, column 1. Step 2, using activated carbon as a catalyst, is not new either—"[i]t is known that the reaction of hydrazine with dissolved oxygen can be catalyzed by passing the hydrazine and water mixture through a bed of activated carbon." *Id.*

According to Ecolochem, these two steps were imperfect, however:

[one] disadvantage of the catalyzed deoxygenation processes of the prior art arises

from the introduction of impurities, such as unreacted hydrazine and carbon contaminants, into the deoxygenated liquid. In the process of removing dissolved oxygen, the prior art systems leave levels of unreacted hydrazine that cannot be tolerated when a liquid such as water is used in certain sophisticated equipment or for the production of refined products.

'411 columns 1–2. Thus, Ecolochem's patent claims a third step—passing the deoxygenated liquid through an ion exchange resin to remove carbon contaminants and excess hydrazine.

B. *The Demmitt Reference.*

In 1960, more than twenty years before the '492 and '411 applications were filed,[2]

2. The '492 application was filed December 16, 1983. The '411 application was filed on July 26,

1985 as a continuation of '492.

T.F. Demmitt wrote a report on a similar deoxygenation process, *Preliminary Report on the Use of Activated Carbon As A Catalyst for the Dissolved Oxygen—Aqueous hydrazine Reaction* (1960) ("Demmitt reference"). Demmitt was concerned that "the [hydrazine/oxygen] reaction proceeds rather slowly in low-temperature systems", and wondered whether activated carbon would hasten the process.

To determine if his experiment was a success, Demmitt measured the oxygen levels in the effluent using the Winkler method. However, because hydrazine interferes with this technique, Demmitt removed the hydrazine by adding a column of acid-regenerated cation resin. Although Demmitt did not discuss carbon contaminants, his cation resin removed at least some of them. Figure 2 shows Demmitt's experimental system in schematic form.

**FIGURE 2:**
Demmitt Reference

C. *The Mobile Water Case.*

In 1988, Ecolochem sued Mobile Water Technology Co. ("Mobile Water"), alleging that Mobile Water had infringed the '492 patent. Mobile Water countered that Ecolochem's invention was obvious, but did not, however, provide the court with the Demmitt reference. After a bench trial, Judge Henley found the '492 patent valid and non-obvious. *Ecolochem, Inc. v. Mobile Water Technology*

*Co.,* 690 F.Supp. 778 (E.D.Ark.1988), *aff'd* 871 F.2d 1096 (Fed.Cir.1989).

### D. *Edison's Process.*

Defendant Southern California Edison Company ("Edison") runs the San Onofre Nuclear Generating Station ("SONGS"). SONGS contains three nuclear reactors, each of which contains two water circulation systems. The primary water circulation system removes heat from the nuclear reactor. The heat from the primary system boils water in a secondary system, turning it into steam. The steam rotates a turbine, which produces electricity. The steam then condenses and recirculates through the secondary system. Because the secondary system loses approximately 1% of its water each cycle, SONGS requires make-up water. Impurities in water circulated through the secondary system can damage steam generators, turbines, and pipes, however, so Edison passes the make-up water through the high-flow make-up demineralizer ("HFMUD"). HFMUD passes the make-up water through a strong acid cation resin bed, a predominantly weak base anion resin bed, an activated carbon bed, a second strong acid cation resin bed, a strong base anion bed, and, finally, a vacuum deareator. This process removes suspended, undissolved solids and dissolved impurities, including salt, mineral ions, organic chemicals, and oxygen.

Ecolochem maintains that Edison's HFMUD infringes '492 claims 1, 2, 5, 6, 7, 8, 9, 10, 15, 16, 17, and 18, and '411 claims 1, 3, 4, 7, 8, 9, 10, 11, 13, 15, 17, 20, and 21. On April 12, 1994, this Court held that the Demmitt reference anticipated '492 claims 1, 5, 6, 8, and 9, and '411 claim 21. Edison now seeks partial summary judgment of non-infringement and patent invalidity. This opinion amends this Court's previous order regarding anticipation, denies Edison's motion for summary judgment of non-infringement, and grants Edison's motion for summary judgment of invalidity due to obviousness.[3]

### II. *Analysis*

A. *Motion for Summary Judgment of Noninfringement*

▮ In a patent case, as in any other, summary judgment is appropriate where there are no genuine issues as to any material fact and the movant is entitled to judgment as a matter of law. *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994); *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1577 (Fed.Cir.1989); F.R.Civ.P. 56(c). To resolve a motion for summary judgment of non-infringement, courts must first determine the scope of the claims, a question of law. *In re Donaldson Co., Inc.,* 16 F.3d 1189, 1192 (Fed. Cir.1994); *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991); *Mannesmann Demag Corp. v. Engineered Metal Products Co.,* 793 F.2d 1279, 1283 (Fed.Cir. 1986). Next, courts must determine whether any reasonable trier of fact could conclude that the accused process falls within the scope of the claims. *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1116 (Fed.Cir. 1985) (en banc). In doing so, "the district court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor." *Id.*

### 1. *CLAIM INTERPRETATION: "Deoxygenation Process".*

▮ Ecolochem's patents describe a "deoxygenation process." Edison contends that a deoxygenation process *eliminates,* not merely reduces, oxygen from a liquid, and that the patented process therefore requires *more* than a stoichiometric amount of hydrazine. Ecolochem disagrees, arguing that the claims do not require *complete* oxygen elimination, and thus do not require more than a stoichiometric amount of hydrazine. To determine which party is correct, this Court reviews (a) the words' ordinary meaning, (b) the patent specification, (c) the other claims, (d) the patent's file history, and (e) expert testimony. Although claim interpretation is a question of law, if "the meaning of a term of art in the claims is disputed and extrinsic evidence is needed to explain the meaning, construction of the claims could be left to a jury." *McGill Inc. v. John Zink Co.,* 736 F.2d 666, 672 (Fed.Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984).

---

**3.** This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338(a).

### (a) *Ordinary Meaning.*

■ The words of a claim "will be given their ordinary and accustomed meaning, unless it appears that the inventor used them differently." *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759 (Fed.Cir.1984) (quoting *Universal Oil Products Co. v. Globe Oil & Refining Co.,* 137 F.2d 3, 6 (7th Cir.1943), *aff'd,* 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944). Ecolochem contends that the ordinary meaning of "deoxygenate" is "to remove oxygen," not necessarily to remove *all* oxygen. *Webster's Ninth New Collegiate Dictionary* (1990). Ecolochem's expert, James K. Rice, agrees, stating that "the term 'deoxygenation process' as used in the water treatment industry would mean a process that removes a substantial amount of dissolved oxygen, not necessarily all of it." Rice Decl. ¶ 13. Citing *Webster's,* Edison argues that "remove" means "get rid of; eliminate" and thus necessarily implies *complete* elimination.

### (b) *Specification.*

Courts often use the specification to help define the terms in the claims. *Jonsson v. Stanley Works,* 903 F.2d 812, 819 (Fed.Cir. 1990); *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1574 n. 2 (Fed.Cir.1985); *Tandon Corp. v. U.S. Int'l Trade Comm'n,* 831 F.2d 1017, 1024 (Fed.Cir.1987); *McGill,* 736 F.2d at 674. Although the '411 and '492 specification do not explicitly define "deoxygenation process," several passages suggest that more than a stoichiometric amount of hydrazine is "needed" or "necessary" to practice the invention.[4] *See* '492 patent col. 4:3–5 (emphasis added) (noting that it is *"necessary ... to use enough hydrazine to completely react* with the dissolved oxygen contained in the liquid."); '411 patent col. 4:6–8. *See also* '492 patent col. 4:5–8; '411 patent col. 4:8–11 ("[I]n the present invention ... hydrazine in amount of ... about 10 to 20% more than a stoichiometric amount is needed to complete-

ly react with the oxygen."); '492 Patent col. 4:28–31 ("[U]nreacted hydrazine is present [after the water exits the carbon bed] because an excess over the stoichiometric amount is beneficially reacted with the liquid, as indicated above."); '411 patent col. 4:31–34. *See Autogiro Co. v. United States,* 384 F.2d 391, 38 (Ct.Claims 1967); *Foster Wheeler Corp. v. Babcock & Wilcox Co.,* 512 F.Supp. 792, 800 (S.D.N.Y.1981).

■ Ecolochem contends that these words do not help define the claims because they fall under the heading "Description of the Preferred Embodiments." As Ecolochem notes, passages in a specification which describe the *preferred* embodiment do not help define the claims. *SRI Int'l,* 775 F.2d at 1122. *See also E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir.1988), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988); *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1571 (Fed.Cir.), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). The "Abstract", "Background of the Invention", and "Summary of Invention" sections do not suggest Edison's interpretation. Thus, this Court finds the specification somewhat ambiguous, and cannot conclude, with confidence, that the words "necessary" and "needed" refer to the invention as a whole, rather than the preferred embodiment.

### (c) *Other Claims.*

"Significant evidence of the scope of a particular claim can be found on review of other claims." *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1570 (Fed.Cir.1983); *see also North American Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1577 (Fed. Cir.1993); *McGill,* 736 F.2d at 674. Edison notes that several of the claims require removal of excess hydrazine, and argues that excess hydrazine will remain in the system *only* if one adds more than a stoichiometric amount of hydrazine.

---

4. Ecolochem argues that this Court should give these remarks no weight because the specification does not *explicitly* state that "these claims only cover the use of a greater than stoichiometric amount of hydrazine." An explicit statement is not necessary, however; a specification can *implicitly* suggest that a term has a certain meaning. *See Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1571 (Fed.Cir.), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). ("The [specification] text does not implicitly suggest that the words should be interpreted [as plaintiff suggests].").

Ecolochem contends that unreacted hydrazine may be present downstream even if one adds *less* than a stoichiometric amount of hydrazine, but fails to present any evidence supporting this contention.[5] Ecolochem also argues that one cannot expect to always add *less* than a stoichiometric amount, even if one tries to. Because the influent's oxygen levels may vary and system operators may err, Ecolochem states that even if one attempts to add *less* than the stoichiometric amount of hydrazine, excess hydrazine may still appear downstream.[6] Such factors, Ecolochem maintains, explain why certain claims require removal of excess hydrazine even though *more* than the stoichiometric amount of hydrazine is not required. Thus, rather than suggest that deoxygenation means oxygen *elimination*, claims requiring hydrazine removal may merely recognize that oxygen levels vary, and that the invention might not always be practiced perfectly.

#### (d) *File History.*

"[A]n invention is construed not only in light of the claims, but also with reference to the file wrapper or prosecution history in the patent office." *Graham v. John Deere Co.,* 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966); *see also Miles Labs., Inc. v. Shandon Inc.,* 997 F.2d 870, 876 (Fed.Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994); *McGill,* 736 F.2d at 673. As Edison notes, the file wrapper remarks that "up until the time that applicants made this invention,.... while stoichiometrically excessive amounts of hydrazine have been suggested for use in the deoxygenation stage, there has been a clear indication that the amount of hydrazine in the deoxygenated product was unimportant." *See* '492 File Wrapper at 41, 43. According to Edison, hydrazine appears in the effluent *only* if more than a stoichiometric amount is used. Therefore, Edison contends that this passage implies that more than a stoichiometric amount of hydrazine is required.

Although the file wrapper clearly *suggests* that those practicing the invention will use more than a stoichiometric amount of hydrazine, it does clearly not state that they *must* do so. Moreover, Ecolochem presents testimony that excess hydrazine must be removed not because the invention requires more than a stoichiometric amount, but due to varying oxygen levels and operating errors. *See supra.* Consequently, the file wrapper is not dispositive.

#### (e) *Expert Testimony.*

"In a patent case involving complex scientific principles, it is particularly helpful to see how those skilled in the art would interpret the claim." *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 657 (Fed.Cir.1986). *See also McGill,* 736 F.2d at 675. As noted above, Ecolochem's expert, Rice, contends that the claims do not require more than a stoichiometric amount of hydrazine. Edison does not present expert testimony on the subject.

#### (f) *Claim Construction—Conclusion.*

The claims quite clearly *recommend* the use of more than a stoichiometric amount of hydrazine, but this Court cannot determine whether the claims *require* it. If Rice's testimony regarding the common, industry meaning of "deoxygenation process" is correct, Ecolochem's interpretation might, in fact, be correct. At a minimum, because the specification, other claims, and prosecution history are somewhat ambiguous, Rice's declaration creates a genuine issue of material fact.

Summary judgment on claim construction is therefore inappropriate. *See Howes v.*

---

5. Rice's declaration does not support Ecolochem's position. Rice states that "[f]eeding a less than stoichiometric amount of hydrazine ... will generally result in substantially complete reaction of the hydrazine." Rice Decl. ¶ 15. If the hydrazine "substantially complete[ly]" reacts, none would be left downstream. Ecolochem also suggests that "[u]nreacted hydrazine can result from channeling of the activated carbon bed [or] microbial contamination of the carbon" even if *less* than a stoichiometric amount is used, Opposition at 2, but fails to cite any *evidence* supporting counsel's argument.

6. As the '492 specification described it:

The unreacted hydrazine is present because an excess over the stoichiometric amount of hydrazine is beneficially reacted with the liquid.... Also, because the dissolved oxygen content of the incoming liquid may vary ... the amount of unreacted hydrazine will vary when a fixed amount of hydrazine, unresponsive to the varying dissolved oxygen content, is added.
'492 Col. 4:28–36.

*Medical Components, Inc.,* 814 F.2d 638, 643 (Fed.Cir.1987) ("If ... expert testimony is needed to explain a disputed term, ... an underlying factual question may arise which makes summary judgment improper."); *Moeller,* 794 F.2d at 657; *Schneider (USA) Inc. v. C.R. Bard, Inc.,* 18 U.S.P.Q.2d 1076, 1990 WL 292143 (D.Mass.1990).

### 2. *INFRINGEMENT*

Because summary judgment is inappropriate on the claim construction issue, Edison is entitled to summary judgment of non-infringement only if no reasonable trier of fact, giving the patents Ecolochem's asserted definition, could conclude that Edison infringes. Edison does not contend that it can make such a showing; thus, Edison's motion for summary judgment of non-infringement is DENIED.

### B. *Motion for Summary Judgment of Patent Invalidity*

■ A patent enjoys a presumption of validity. 35 U.S.C. § 282. Nevertheless, a claim may be held invalid where an alleged infringer proves, by clear and convincing evidence, that a prior art reference anticipates the invention, 35 U.S.C. § 102(b), or renders it obvious, 35 U.S.C. § 103. *See, e.g., Medtronic Inc. v. Intermedics, Inc.,* 799 F.2d 734, 741 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). This Court is not a "Super Patent Examiner," empowered to second-guess the PTO. *Mobile Water,* 690 F.Supp. at 781 (citing Markey, *On Simplifying Patent Trials,* 116 F.R.D. 369, 375–76 (1987)). Nevertheless, this Court has a special duty to scrutinize cases where relevant references were not presented to the PTO. *See EWP Corp. v. Reliance Universal Inc.,* 755 F.2d 898, 905 (Fed.Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985) ("[I]n considering [validity] we have no PTO view before us on [validity] in view of those references and appellants' burden of proof under 35 U.S.C. § 282 is more easily carried."); *Jervis B. Webb Co. v. Southern Systems, Inc.,* 742 F.2d 1388, 1392 (Fed.Cir.1984).

### 1. *ANTICIPATION*

Under 35 U.S.C. § 102(b), a patent is "anticipated" by a prior publication and, therefore invalid if "the invention was ... described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States...." An anticipatory reference must (a) be a "printed publication" published more than one year before the filing date of the patent application; and (b) describe the invention clearly enough that one of ordinary skill in the art could make it. *See, e.g., In re Hall,* 781 F.2d 897, 899 (Fed. Cir.1986).

### (a) *"Printed Publication"—Was the Demmitt Reference Sufficiently Accessible?*

■ A reference is a "printed publication" under § 102(b) if it was "available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, [could] locate it." *In re Wyer,* 655 F.2d 221, 226 (C.C.P.A.1981). *See also Constant,* 848 F.2d at 1568–69; *Hall,* 781 F.2d at 900. However, Edison need not show that members of the public *actually received* the information. *Constant,* 848 F.2d at 1569; *Wyer,* 655 F.2d at 226.

If a publication is kept in a public library or database, the inquiry usually focuses on whether the document has been catalogued and shelved. *In re Cronyn,* 890 F.2d 1158, 1161 (Fed.Cir.1989); *Wyer,* 655 F.2d at 226. For instance, a dissertation written in German and catalogued in a single German university library *is* sufficiently accessible. *Hall,* 781 F.2d at 899–900. *See also Wyer,* 655 F.2d at 223, 226–27 (a microfilmed Australian patent application on file and open to public inspection at the Australian Patent Office and five sub-offices was sufficiently accessible); *Siemens–Elema AB v. Puritan–Bennett Corp.,* 13 U.S.P.Q.2d 1804, 1806, 1989 WL 200919 (S.D.Cal.1989), *aff'd,* 925 F.2d 1480 (Fed.Cir.1991) (a patent application held at a Swedish patent office was a printed publication even though "it was not published in a journal"). In contrast, three student theses, catalogued only by student name in a chemistry department library, were *not* sufficiently accessible because "the

only research aid was the student's name, which, of course, bears no relationship to the subject of the student's thesis." *Cronyn,* 890 F.2d at 1160–61. *See also Application of Bayer,* 568 F.2d 1357, 1367 (C.C.P.A.1978) (holding that an *un* catalogued thesis is not a § 102(b) publication).

■ Thus, although other factors are relevant, publications are generally sufficiently accessible if they are properly catalogued in a public library or database.[7] At least one case suggests that subject matter indexing is not required so long as an alternative research aid, such as an abstract, is available. *Mobil Oil Corp. v. Amoco Chemicals Corp.,* 779 F.Supp. 1429, 1489 (D.Del.1991), *aff'd,* 980 F.2d 742 (Fed.Cir.1992) (finding that abstracts, although "not an ideal system for retrieving information," may make a publication sufficiently accessible under § 102(b)).

(i) *Edison's Evidence of Accessibility.*

■ *Through the U.S. Government.* The Demmitt reference has been indexed and catalogued at the Energy Information Center of the U.S. Department of Energy and has been available to the general public since 1960. Morton Decl. ¶¶ 5–9. According to an Office of Scientific and Technical Information form, the Demmitt reference was catalogued under (1) "Oxygen—Reaction with Aqueous Hydrazine, Effects of Activated Carbon Catalysts", (2) "Hydrazine—Reaction with Oxygen in Aqueous Media, Effects of Activate Carbon Catalysts", and (3) "Carbon (Activated)—Use as a Catalyst for Oxygen—Hydrazine Reaction". Anderson Suppl. Decl. Exh. 1, at 8. Moreover, on August 26, 1960, Demmitt was distributed on microcard to contractors as well as to domestic and foreign libraries. *Id.* Exh. 1 at 3, 7.

Edison also submits evidence that the Demmitt reference was accessible to the public through the U.S. Department of Energy's "Nuclear Science Abstracts" (NSA), a publi-

cation listing U.S. Government reports which is available at many public libraries, including the library of the California Institute of Technology in Pasadena, California. Morton Decl. ¶¶ 5–6.[8] NSA listed the Demmitt abstract in 1960, albeit under the heading "General and Miscellaneous" rather than under "Deoxygenation," "Degasification," or "Corrosion Reduction." Aitkin Decl. ¶ 8; Exh. 3 to Morton Decl.

*Through Microcard at Public Libraries.* Edison also presents evidence that the Demmitt reference was available prior to 1982 on microcard at Northwestern University's Seeley G. Mudd Library for Science and Engineering. Anderson Decl. Exh. 2. The microcard lists the detailed title "Preliminary Report on the Use of Activated Carbon as a Catalyst for the Dissolved Oxygen–Aqueous Hydrazine Reaction," suggesting that one would have been able to find the Demmitt reference by searching through the Seeley library's collection of Atomic Energy Commission microcards.

The same microcard has also been available since 1960 at both the University of California at Berkeley library and the Cleveland Public library. Anderson Decl. Exh. 2.

(ii) *Ecolochem's Rebuttal Evidence.*

■ Ecolochem does not challenge Edison's evidence but instead attempts to identify several reasonably diligent interested persons who actually searched for prior art yet failed to find Demmitt. Although Edison argues to the contrary, such evidence is obviously relevant because it tends to make it more probable that the Demmitt reference could not, in fact, be found by interested, reasonably diligent persons ordinarily skilled in the art. F.R.Evid. 401. Nevertheless, because evidence of unsuccessful searches invites a time-consuming digression of only marginal probative value, this Court finds that such evidence is inadmissible under F.R.Evid. 403. Evaluating unsuccessful

---

7. Judge Mayer, dissenting in *Cronyn,* de-emphasizes the significance of cataloging: "[t]he existence or nature of an indexing system is only one factor to be considered in assessing the public availability of a work; it is neither a necessary nor a sufficient condition for publication." *Cronyn,* 890 F.2d at 1161 (Mayer, J., Dissenting).

8. According to a document called "Cumulative Report Index" published in 1966, the Demmitt Reference was available for $1.80 from OTS, a clearinghouse of the National Bureau of Standards of the U.S. Department of Commerce. Morton Dec. ¶ 7.

searches would require an expensive, distracting inquiry into the minutia of library research.[9] Ultimately, this effort would create more smoke than light. Patent cases are already complex, time-consuming, and expensive, and this Court is loathe to make them unnecessarily more so.[10]

Nevertheless, Ecolochem contends that *Hall* requires this Court to embark upon this wasteful tangent. This Court disagrees. *Hall* affirmed a § 102(b) rejection based on a dissertation catalogued in a single German University, relying on a declaration from the director of the library. Although the director was unable to give the exact date the dissertation was catalogued and shelved, he testified that, based on the library's usual procedures, the dissertation "most probably was available for general use toward the beginning of the month of December, 1977." *Hall*, 781 F.2d at 899. Because the critical date was three months later, the Court held the claims invalid.

As Ecolochem emphasizes, the Federal Circuit remarked that the director's testimony was "unrebutted." 781 F.2d at 900. Ecolochem mistakenly interprets this remark as a suggestion that the *Hall* applicant could have introduced rebuttal evidence of unsuccessful searches by *anyone*, including those seeking prior art *outside the German University library*. This Court believes that

*Hall* sought only evidence to rebut the director's testimony regarding the date that the dissertation was indexed, catalogued, and shelved. For instance, a library employee might have testified that the dissertation was actually shelved three months, *after* the critical date. Similarly, another student or professor might have testified that he looked for the dissertation at the University library in late February 1978, but was told that it would not be shelved and accessible for another two weeks, *after* the critical date.

Such evidence is unlike the evidence Ecolochem attempts to introduce here. Ecolochem's evidence does not rebut Edison's claim that the microcards could be found at the Northwestern, Cleveland, or Berkeley libraries, or that the NSA abstracts were accessible. Rather, Ecolochem offers evidence that, despite the reference's presence in these locations, particular individuals looking for prior art failed to unearth it. Nothing in *Hall* suggests that this Court must admit such evidence. To do so would dilute § 102's high standard of diligence.

### (iii) *Demmitt was Sufficiently Accessible Under § 102(b).*

"[W]here there are no disputed factual issues, the question [of] whether particular material is a 'printed publication' is a ques-

---

9. A court engaging in such an inquiry might have to ask: What exactly did the unsuccessful searcher seek? How thoroughly did he conduct his search? How many libraries must be searched for an effort to be considered diligent? Which libraries must be searched? Which search techniques should be used? How should a court evaluate the inevitable testimony of a library expert that an equally diligent search, conducted differently, would have disclosed the reference? How many unsuccessful searches are sufficient to rebut evidence of § 102(b) availability? Can evidence of unsuccessful searches be rebutted by evidence of successful searches? If yes, how should a court weigh the two?

10. Federal Circuit case law emphasizes that parties asserting § 102(b) bars need *not* show that members of the public actually received the information, implicitly supporting this result. *See, e.g., Constant,* 848 F.2d at 1569; *Wyer,* 655 F.2d at 226.

*See also* 1 *Lipscomb's Walker on Patents* § 4:23 at 342 ("A printed publication capable of ne-

gativing novelty is anything that is printed and is distributed to any part of the public in any country without any injunction of secrecy.... Anything that is printed and made accessible to any part of the public is a printed publication."); *Friction Div. Products v. E.I. DuPont de Nemours & Co.,* 658 F.Supp. 998, 1008 (D.Del.1987), *aff'd* 883 F.2d 1027 (Fed.Cir.1989) ("Cataloging a paper in a technical or scientific library makes the publication sufficiently accessible to those interested in the art to satisfy the requirements of § 102(b).").

This result is also consistent with the standard of availability under § 102(a). *In re Carlson,* 983 F.2d 1032, 1037 (Fed.Cir.1992) ("We recognize that Geschmacksmuster on display for public view in remote cities in a far-away land may create a burden of discovery for one without the time, desire, or resources to journey there in person or by agent to observe that which was registered and protected under German law. Such a burden, however, is by law imposed upon the hypothetical person of ordinary skill in the art who is charged with knowledge of all the contents of the relevant prior art.").

tion of law." *Cronyn,* 890 F.2d at 1159.[11] Edison's evidence regarding availability through the United States Government, NSA, Northwestern, U.C. Berkeley, and the Cleveland Public Library is, therefore, undisputed, unrebutted, and, measured against the evidence accepted in *Hall,* unquestionably clear and convincing. Thus, this Court finds that the Demmitt reference was sufficiently accessible as a matter of law.

### (b) *Does Demmitt Sufficiently Describe the Process?*

An anticipatory reference must not only be sufficiently accessible, but also describe the invention so that one of ordinary skill in the art can practice it. *See, e.g., Hall,* 781 F.2d at 899. Generally, "for prior art to anticipate under § 102 it has to meet *every* element of the claimed invention." *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1379 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987) (emphasis added). However, "[a]n anticipatory reference ... need not duplicate word for word what is in the claims. Anticipation can occur when the claimed limitation is 'inherent' or otherwise implicit in the relevant reference." *Standard Havens Products, Inc. v. Gencor Indust., Inc.,* 953 F.2d 1360, 1369 (Fed.Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992). *See also Akzo N.V. v. U.S. Int'l Trade Comm'n,* 808 F.2d 1471, 1479 (Fed.Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *In re King,* 801 F.2d 1324, 1326 (Fed.Cir.1986).

 The prior art need not have intended to achieve the same result as the claimed process, so long as the result was a necessary consequence of the process. *See, e.g., Verdegaal Bros., Inc. v. Union Oil Co.,* 814 F.2d 628, 633 (Fed.Cir.), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987) (stating that defendant "did not have the additional burden of proving that [the prior art] recognized [all of the] capabilities" of the claimed

process); *King,* 801 F.2d at 1326; *H.K. Regar & Sons v. Scott & Williams,* 63 F.2d 229, 231 (2d Cir.1933) (Learned Hand, J.) ("[W]hen the result is a necessary consequence of what was deliberately intended, it is irrelevant that it was then valueless for the purposes in mind."). *See also* Chisum, § 3.03 ("[A]nticipation is not avoided where the prior achievement was ... a necessary consequence of what was intended, even though the achiever did not fully appreciate or recognize the ... properties of the ... process.").

Edison contends that the Demmitt reference discloses each and every step or element of '492 claims 1, 5, 6, 8, 9, 15 and 16 and '411 claim 21. Ecolochem concedes that the Demmitt reference invalidates '492 claims 8 and 9 and '411 claim 21, but argues that it does not sufficiently describe '492 claims 1, 5, 6, 15 and 16. Before addressing these contentions, this Court must interpret the relevant claims.

### (i) *Claims That Require Dissolved Carbon Contaminant Removal—'492 claims 1, 5 and 6.*

 *Claim Interpretation.* Claims 1, 5, and 6 of the '492 patent teach

A deoxygenation process comprising a first step of adding hydrazine to a liquid containing dissolved oxygen, a second step of passing said liquid through a bed of activated carbon to catalyze a reaction between said dissolved oxygen and said hydrazine whereby an amount of dissolved carbon contaminants are added to said liquid, and a third step of passing said liquid through *an ion exchange resin selected from the group consisting of a mixed bed resin and cation resin to remove at least said dissolved contaminants.*

*See, e.g.,* '492 claim 1 (emphasis added).[12] Unlike '411 claims 1–20, which specify a strong acid cation *and* a strong acid anion exchange resin, '492 claims 1, 5, and 6 specify

---

11. Therefore, Rice's opinion that the Demmitt reference was not sufficiently accessible does not create a genuine issue of material fact.

12. The fifth claim teaches "[t]he process of claim 1, wherein, after said second step, an amount of

unreacted hydrazine remains in said liquid, and wherein said unreacted hydrazine is removed in said third step." The sixth claim teaches "[t]he process of claim 1, wherein said liquid is water."

"an ion exchange resin *selected from the group consisting of* a mixed bed resin and cation resin." Thus, these claims are "Markush claims", as they call for "material *selected from the group* of x, y, and z". Chisum § 8.06[2]; *Application of Driscoll*, 562 F.2d 1245, 1249 (C.C.P.A.1977); *Ex parte Markush*, 125 C.D. 126, 340 O.G. 839 (Comm'r Pat. 1924). By using Markush language, Ecolochem implicitly asserts that the members of the group are "alternatively usable for the purposes of the invention, and therefore, regardless of which of the alternatives is [used], the compound as a whole will exhibit the disclosed utility." *Driscoll*, 562 F.2d at 1249; *Application of Edwards*, 568 F.2d 1349, 1352 (C.C.P.A.1978); *Application of Skoll*, 523 F.2d 1392, 1397 (C.C.P.A.1975).

Ecolochem nonetheless asks this Court to give the claims the following interpretation: (1) "an amount of dissolved carbon contaminants" means cation and/or anion contaminants; (2) "to remove at least said dissolved contaminants" means to completely eliminate *all* of the dissolved carbon contaminants, including anionic contaminants;[13] and (3) "selected from the group consisting of a mixed bed resin and cation resin" means that those practicing the invention must choose carefully between the resins, because although a mixed bed resin will remove essentially *all* ionic carbon contaminants, a cation resin will remove only cationic carbon contaminants. Rice Decl. Exh. 10 ¶ 5. In other words, Ecolochem appears to argue that it claims a third step which removes all ionic carbon contaminants by passing the liquid through an ion exchange mechanism which can be a cation resin if the activated carbon has only cation constituents, but must be a mixed bed

resin if the activated carbon has anionic constituents. Usually, Ecolochem suggests, those practicing the invention will choose a mixed bed resin, because most activated carbons leach anionic, as well as cationic contaminants. Rice Decl. ¶ 9. Thus, Ecolochem argues that, notwithstanding the claims' Markush language, a mixed bed and a cation resin are *not* always "alternatively usable for the purposes of the invention." *Driscoll*, 562 F.2d at 1249.

■ This argument has no merit. Ordinarily, parties using Markush language cannot defeat challenges to validity by focusing on the *differences* between the members of a Markush group.

> By the presentation of this Markush group, appellant has made a representation that for the purpose of the claimed invention the elements of the group are equivalents. Having made the representation ... appellant may not now argue that these two elements are not equivalents.

*Skoll*, 523 F.2d at 1397.[14] Ecolochem neither addresses the Markush issue nor articulates any reason why this Court should not conclude that a mixed bed and a cation resin are equivalents for purposes of the invention. Nothing in the specification supports Ecolochem's interpretation or states that a cation resin *cannot* be chosen in combination with certain types of activated carbon—the specification states merely that "when the end use requires the removal of both hydrazine and [carbon] contaminants the use of a mixed bed is *preferred*," not required. '492 col. 5 (emphasis added).[15] Therefore, this Court rejects any interpretation of the claims which

---

13. This interpretation seems inconsistent with Ecolochem's interpretation of "deoxygenation". Ecolochem argues that to "remove" oxygen does *not* imply elimination, but that to "remove" carbon contaminants *does* imply elimination.

14. In *Skoll*, the Court of Customs and Patent Appeals found that two prior art references, read together, rendered one member of plaintiff's Markush claim obvious and thereby invalidated the entire claim. 523 F.2d at 1396–97. The *Skoll* plaintiff argued that the members of its Markush group were not in fact equivalent, and that the non-obviousness of the non-preferred member of the Markush group should not invalidate the entire claim. The court disagreed.

15. The specification's failure to describe when a cation resin can be used is telling. "[W]here an applicant undertakes to define his invention by the recitation of a Markush group, he must enable one skilled in the art to make and use at least one composition employing each member of the Markush group." *Application of Fouche*, 439 F.2d 1237, 1242 (C.C.P.A.1971). As Ecolochem believed that the skill in the art was "in need of improvement" and "modest" at best, *see infra*, this Court is surprised that Ecolochem expected one of ordinary skill to know when a cation resin could be used.

implies that a cation resin and mixed bed resin are not always alternatively usable for the purposes of the invention.

Claim interpretation thus becomes a straightforward exercise in logic. The claims do not limit the types of activated carbon which may be used, so those practicing the invention might use activated carbon that would leach *both* cationic and anionic contaminants. Because a cation resin removes only cationic, not anionic, carbon contaminants, the language "an amount of dissolved carbon contaminants are added to said liquid ... and at least said dissolved contaminants [are removed]" has only two viable interpretations: (1) "an amount of dissolved carbon contaminants" refers to both cationic and anionic contaminants but "at least said dissolved contaminants [are removed]" refers to removal of at least *some* of the contaminants (i.e., cationic contaminants); or (2) "an amount of dissolved carbon contaminants" refers only to cationic contaminants and "at least said dissolved contaminants [are removed]" refers to complete removal of the cationic contaminants. This Court need not choose between these two interpretations, because Demmitt anticipates in either case.[16]

■ *Demmitt Anticipates '492 Claims 1, 5, and 6.* Whether a reference discloses each element of the claim is a question of fact. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1574 (Fed.Cir. 1986). Ecolochem effectively concedes that Demmitt discloses the first two steps of '492 claims 1, 5, and 6. Thus, this Court need only review Ecolochem's Markush claim and determine whether Demmitt discloses the third step.

■ The novelty of a claim with a Markush group is determined as if the claim were generic. *See* Chisum § 8.06[2][f]. Consequently, "when ... a claim covers several compositions, the claim is 'anticipated' if *one* of them is in the prior art." *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 782 (Fed.Cir.1985). *See also General Electric Co. v. Hoechst Celanese Corp.*, 740 F.Supp. 305, 313 (D.Del.1990) ("claim covering multiple chemical compositions [such as mixed beds and cation beds] ... is anticipated if any one composition is disclosed by prior art"). Although Demmitt does not teach the use of a mixed bed, it indisputably discloses the use of a cation bed, which is unquestionably one of the compositions disclosed by Ecolochem's Markush group. Even though Demmitt did not discuss cation carbon contaminants, such contaminants are indisputably added when Demmitt is practiced, and are indisputably removed. *See* Smallwood Depo. at 254–62; Clifford Decl. ¶ 19. No reasonable jury could conclude otherwise; therefore, Demmitt anticipates '492 claims 1, 5, and 6 as a matter of law.[17]

(b) *Claims That Require Substantially Complete Removal of Unreacted Hydrazine—'492 claims 15 and 16.*

■ *Claim Interpretation.* Claims 15 and 16 of the '492 patent teach

A deoxygenation process comprising a first step of adding hydrazine to a liquid containing dissolved oxygen, a second step of passing said liquid though activated carbon to catalyze a reaction between said dissolved oxygen and said hydrazine, and a third step of *substantially completely removing said hydrazine* by passing said liquid through an ion exchange resin se-

---

**16.** Rice's declaration does not preclude summary judgment on this issue. The meaning of those claims hinges on the significance of Markush language, *not* on the industry meaning of a term of art. *See Howes*, 814 F.2d at 643.

**17.** As a last-ditch defense, Ecolochem argues that Demmitt, which did not concern itself with carbon contaminants, cannot anticipate by "accident" or "unwitting duplication." Opposition at 10–11 (citing *Application of Marshall*, 578 F.2d 301, 304 (C.C.P.A.1978); *Application of Felton*, 484 F.2d 495, 499–500 (C.C.P.A.1973)). As Ecolochem notes, Demmitt was concerned simply

with removing excess hydrazine in order to measure oxygen levels using the Winkler method, not with removing carbon contaminants. Thus, Ecolochem argues, Demmitt does not anticipate.

Ecolochem misunderstands the meaning of accident. A true accident is not reproducible. *See, e.g.*, Chisum § 3.03. Demmitt's "accidental" removal of cation contaminants is, as even Ecolochem appears to concede, a natural and necessary consequence of using a cation exchange resin. *See, e.g., King*, 801 F.2d at 1326; *H.K. Regar & Sons*, 63 F.2d at 231.

lected from the group consisting of mixed bed resin and cation resin to remove at least said dissolved contaminants.

*See, e.g.,* '492 patent claim 15 (emphasis added).[18] Ecolochem maintains that "substantially complete" removal means removal to a level of less than one part per billion ("ppb"), citing '492 Patent Example 1.

Edison neither challenges Ecolochem's right to "be [its] own lexicographer" nor attacks its chosen definition. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Therefore, this Court assumes that "substantially complete" removal of hydrazine means removal to a level of less than one ppb.

*Summary Judgment is Inappropriate on '492 Claims 15 and 16.* Whether Demmitt "substantially completely" removes excess hydrazine is a question of fact. *Hybritech Inc.,* 802 F.2d at 1379. Edison is entitled to summary judgment only if it demonstrates that a reasonable trier of fact *must* find by clear and convincing evidence that Demmitt either inherently or explicitly removes· hydrazine to levels of less than one ppb. Edison fails to meet this burden. Its evidence consists of two statements: (1) Demmitt's remark that "[t]he purpose of this [cation] resin was to remove the residual hydrazine;" and (2) Ecolochem's concession that "[i]t is entirely possible and indeed likely that Demmitt achieved the substantially complete removal of hydrazine as taught by Ecolochem." Morton Decl., Exh. 2 at 3.

While the Demmitt reference indisputably discloses "removal" of hydrazine, it focused on removing hydrazine only to the extent necessary to use the Winkler method—up to one-hundred ppb. Rice Decl. Exh. 10 ¶ 11. Demmitt does not state that the cation resin removed hydrazine to less than one ppb. Thus, Demmitt does not expressly anticipate '492 claims 15 and 16. Moreover, Ecolochem's concession that "[i]t is entirely possible and indeed likely that Demmitt achieved the substantially complete removal of hydrazine as taught by Ecolochem," does not establish that Demmitt *inherently* anticipates

the claims. Edison must present evidence that a reasonable trier of fact would *necessarily* find *clear and convincing.* These luke-warm statements do not suffice, and Edison does not present any expert testimony that Demmitt necessarily, or in its "normal and useful operation" reduces hydrazine to levels less than one ppb. *King,* 801 F.2d at 1327. *Cf. Akzo N.V.,* 808 F.2d at 1479 (stating that "concentrated sulfuric acid is not inherently 98% sulfuric acid to one skilled in the art" where the claim called for 98% sulfuric acid and the reference called for concentrated sulfuric acid). Therefore, Edison's motion for summary judgment on '492 claims 15 and 16 is ·hereby DENIED.

2. *NON–OBVIOUSNESS*

■ Under 35 U.S.C. § 103,

A patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art ..."

Obviousness is a legal conclusion based upon four factual inquiries: (a) the scope and content of the prior art; (b) the differences between the prior art and the claimed invention; (c) the level of ordinary skill at the time the invention was made; and (d) objective evidence of secondary considerations. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1270 (Fed.Cir.1991); *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve Inc.,* 796 F.2d 443, 447 (Fed.Cir.1986), *cert. denied,* 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987).

■ So long as a court views all factual disputes regarding these factors in the light most favorable to the patentee, it may weigh the factors and grant summary judgment of invalidity. *See Ryko Mfg. Co. v. Nu–Star, Inc.,* 950 F.2d 714, 719 (Fed.Cir.1991) (holding that, on a motion for summary judgment, district court may "weigh all considerations, primary and secondary" and conclude that secondary considerations do "not carry suffi-

---

**18.** Claim 16 teaches "[t]he process of claim 15, wherein said liquid is water."

cient weight to override a determination of obviousness based on primary considerations."); *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 768 (Fed.Cir.1988), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989); *Foster v. Hallco Mfg. Co.,* 22 U.S.P.Q.2d 1351, 1357, 1991 WL 340568 (D.Or.1991).

*Mobile Water* analyzed these factors, and found the '492 patent valid. The case is highly persuasive on issues for which the evidence has not changed, although it is not binding. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1564 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987) ("A trial court is required by Congress, 35 U.S.C. § 282 ... to say only whether the patent challenger has carried its burden of establishing invalidity in the particular case before the court ... [If the patent challenger fails to do so,] the patent simply remains valid until another challenger carries the § 282 burden.").

However, *Mobile Water* is entitled to little weight, if any, on issues for which new evidence is presented. *See Multi–Tech Sys., Inc. v. Hayes Microcomputer Products, Inc.,* 800 F.Supp. 825, 838 (D.Minn.1992).

(a) *Scope and Content of the Prior Art.*

 Edison presents the Houghton reference, which discloses the first two steps of Ecolochem's process,[19] and the Martinola[20] and Bechtel[21] publications, which "recognize the potential of the Houghton process and caution that the use of activated carbon may release impurities into the effluent." *Mobile Water,* 690 F.Supp. at 783. Edison also presents the Hassler reference[22] and the Hegde patent,[23] which reveal that some forms of activated carbon give off ionic contaminants and that an ion-exchange resin can remove these contaminants. Each of these references was before the *Mobile Water* court. However, neither the *Mobile Water* court nor the patent examiner had the Demmitt reference.[24] Demmitt tested the Houghton process by injecting hydrazine into oxygenated water and running the water over a bed of activated carbon, which catalyzed the hydrazine/oxygen reaction. Because hydrazine interfered with Demmitt's test for measuring oxygen levels (the Winkler method), Demmitt added a cation exchange column to reduce hydrazine levels in a test sample.

Demmitt also discussed using deoxygenated water in power plants, noting that the Houghton process "would be useful in high temperature reactors." Demmitt at 2. By 1982, other prior art, including the Bechtel reference, discussed this application. '411 File Wrapper at 4 ("It would have been obvious to one of ordinary skill in the art to ... employ this deoxygenated stream in a power-generating apparatus, as suggested by the Bechtel publication.") (Statement of the Patent Examiner).

Thus, the scope and content of the prior art before this Court can be described roughly as follows:

(i) The Houghton reference, which disclosed using a bed of activated car-

---

19. *See* Houghton & Cuerdon, *The Use of Active Carbon with Hydrazine in the Treatment of Boiler Feed Water,* Int'l Water Conference, Bournemouth, England pp. 54–58 (1957).

20. Martinola, et al., "Saving Energy by Catalytic Reduction of Oxygen in Feedwater" in *Proceedings 41st Int'l Water Conference, Eng'g Soc'y of Western Penn.* 77–83 (1980).

21. Bechtel Group, Inc., *Guide to the Design of Secondary Systems and their Components to Minimize Oxygen Induced Corrosion* (1982).

22. J.W. Hassler, *Purification with Activated Carbon* 51 (1974) ("In general, the use of the ion-exchanger should follow the treatment with carbon, especially if the carbon contains any appreciable amount of inorganic compounds.").

23. The Hegde patent notes:

 Activated carbons contain ionic impurities, and occasionally collect microorganisms, which are released into the water. They are therefore normally used prior to treatment of the water with mixed ion exchange resins which remove the ions released.

Hegde, Patent No. 4,430,266 co. 1:37–41.

24. Because Demmitt is considered prior art for § 102(b) purposes, it is also prior art for § 103 purposes. *See, e.g., Hodosh v. Block Drug Co.,* 786 F.2d 1136, 1142 (Fed.Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986) (criticizing the district court for applying different standards for § 102 and § 103).

bon to catalyze the oxygen/hydrazine reaction;

(ii) Martinola and Bechtel, which recognized that the Houghton process had potential as a method for deoxygenation, but warned that activated carbon would release carbon contaminants;

(iii) Hassler and the Hegde patent, which recognized that activated carbons release ionic impurities into the water, and noted that ion exchange resins would remove these impurities;

(iv) Demmitt, which added a cation exchange resin to the end of the Houghton process to facilitate the Winkler measurements; and

(v) Bechtel and Demmitt, which recognized that the deoxygenated stream would be useful in power-generation systems.

(b) *The Differences Between the Prior Art and the Claimed Invention.*

Ecolochem claims an "invention resid[ing] in the *combination* of very old and well-known components." Opp. at 32. It admits that prior art "taught the Houghton process, that carbon leaches contaminants, that ion exchange resins would remove hydrazine, and the use of ion exchange resins downstream of activated carbon [to remove ionic carbon contaminants]." However, it contends that none of the prior art put all of these elements together.

(c) *Level of Skill in the Art.*

■ Courts determine the level of skill in the art by evaluating the educational background of the inventors, the educational level of those in the industry, and the sophistication of the technology involved. *Ryko*, 950 F.2d at 718. The *Mobile Water* court concluded that the "level of *ordinary* skill in the art is ... modest," although "[t]here exists a core of individuals with a high level of formal scientific education who keep abreast of developments in the art." 690 F.Supp. at 784. As in *Mobile Water*, Ecolochem characterizes the level of skill as "in need of improvement," declining to define the issue more precisely.

Edison argues that this "in need of improvement" testimony is a complete failure of proof.[25] Relying on evidence allegedly not presented in *Mobile Water*, it asks the Court to disregard *Mobile Water* and reject Edison's definition. Although this Court agrees that Ecolochem's "in need of improvement" testimony is itself in need of improvement, this Court chooses to defer to *Mobile Water* at this early stage in the case. Therefore, for purposes of this summary judgment motion, this Court will assume that the level of skill in the art was "modest" at best.

(d) *Objective Evidence of Secondary Considerations.*

■ Secondary considerations, such as commercial success, long felt but unresolved needs, and failed attempts, may indicate that an invention is non-obvious. *See, e.g., Bausch & Lomb*, 796 F.2d at 450. As in *Mobile Water*, Ecolochem presents considerable evidence that the invention was a commercial success, had a great impact on the industry, and satisfied a long-felt need. *See Mobile Water*, 690 F.Supp. at 784–85.[26]

---

**25.** Edison contends that a person of ordinary skill in the art would have at least a bachelor's degree in chemistry, would have worked in the industry for several years, and would have periodically attended industry conferences. As Edison notes, named co-inventor William S. Miller has a B.S. in chemistry, and has worked in the field for twenty-six years. Miller Depo. at 17–19. His co-inventor, Richard C. Dickerson, attended college for four years and has worked in the water treatment field for thirty years. Trial Tran. of *Ecolochem, Inc. v. Mobile Water Co.* (Feb. 2–3, 1988), at 91–92. Peter S. Meyers, the technical manager of the company supplying Edison's accused process, majored in chemistry and has worked for nineteen years in the water treatment field.

**26.** Specifically, Ecolochem presents evidence suggesting that the industry has desired deoxygenated water without contaminants for years, yet failed to create Ecolochem's invention. Florida Power & Light, "despite knowledge of [the] Houghton [process]," and a need for a clean deoxygenation process, allegedly failed to develop the invention and instead purchased a license from Ecolochem. Edison itself also allegedly failed, as did the Bechtel Group, Ecolochem's major competitors and several chemical suppliers. Opp. at 43–44.

Moreover, Ecolochem also argues that the invention has been well-received by the entire industry, including Edison. Ecolochem's sales allegedly have jumped tenfold since it began mar-

Edison counters that this evidence does not prove that anyone unsuccessfully attempted to develop the invention.[27] Edison's arguments are little more than invitations to weigh Ecolochem's evidence, and attacks on its credibility. On a motion for summary judgement, this Court must view the evidence in the light most favorable to Ecolochem, and assume that this evidence proves commercial success, long-felt but unresolved need, and the other secondary considerations.

### (e) Obviousness—Legal Conclusion.

Because "[o]bviousness is a legal conclusion based on factual determinations and not a factual determination itself", *Aktiebolaget Karlstads Mekaniska Werkstad v. United States Int'l Trade Comm'n*, 705 F.2d 1565, 1575 (Fed.Cir.1983), this Court may weigh the four factual factors and, if proper, grant summary judgment of invalidity so long as there are no genuine issues of material fact as to the factors themselves. *See, e.g., Ryko*, 950 F.2d at 719.

In weighing these factors, this Court must determine whether the prior art provides "*some teaching, suggestion, or incentive to make the combination* made by the inventor." *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 934 (Fed.Cir.1990), *cert. denied*, 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990) (emphasis added). *See also Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir.1993); *In re Jones*, 958 F.2d 347, 351 (Fed.Cir.1992); *In re Mills*, 916 F.2d 680, 682 (Fed.Cir.1990); *Mobile Water*, 690 F.Supp. at 783.[28] The suggestion to make the combination need not be explicit, so long as it "may be fairly inferred from" a prior art reference. *In re Gorman*, 933 F.2d 982, 986–87 (Fed.Cir.1991). *See also In re Nilssen*, 851 F.2d 1401, 1403 (Fed.Cir.1988).

Finally, although the suggestion in the prior art must be obvious to a person of ordinary skill in the art, the hypothetical person of ordinary skill "is presumed to know *all* the pertinent prior art, whether or not the applicant [was] actually aware of its existence." *In re Carlson*, 983 F.2d 1032, 1038 (Fed.Cir.1992) (emphasis added); *see also Nilssen*, 851 F.2d at 1403; Chisum § 5.04[1] ("[H]e is presumed to have perfect *knowledge* of all the pertinent prior art—however obscure its source.").

*'411 Claim 20.* Claim 20 of the '411 patent describes:

A deoxygenation process comprising a first step of contacting a liquid containing dissolved oxygen and hydrazine with a bed of activated carbon to catalyze a reaction between said dissolved oxygen and said hydrazine, whereby an amount of dissolved carbon contaminants is added to said liquid, and a second step of removing at least said dissolved contaminants by passing said liquid through a strong cation exchange resin and a strong base anion resin.

The first step, passing liquid containing hydrazine over a bed of activated carbon, is the Houghton process. A person of even modest skill would recognize that passing the liquid over the carbon bed would add ionic impurities. Martinola; Bechtel. Moreover, a person of modest skill would have recognized that an ion exchange resin would re-

keting the patented process. Such success, Ecolochem maintains, "infers [sic] that many before had tried but failed to make Ecolochem's invention." *Id.* at 57.

27. Edison argues that Ecolochem presents little more than the opinion of its expert, James Rice, who had not even heard of the Houghton process before *Mobile Water*. Furthermore, Edison notes that the prosecution history does not mention a long-felt need to rectify the problem of carbon contaminants, a fact which Edison finds curious in light of the patent's allegedly difficult prosecution history—the patents were initially completely rejected by the patent examiner, '492 File Wrapper Paper No. 4, then rejected in part, *id.*,

Paper No. 8, before they were finally approved. *See Phillips Elec. & Pharmaceutical Indus. Corp. v. Thermal & Elec. Indus. Inc.*, 450 F.2d 1164, 1175 (3d Cir.1971) ("long and tortuous course in the patent office militates against validity.).

28. Consequently, this Court must view each of Ecolochem's claims "as a whole." *W.L. Gore & Assoc. v. Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed.Cir.1983) ("A court's restriction of a claimed multi-step process to one step constitutes error, [if] done ... at the behest of an accused infringer relying on that restriction to establish invalidity by showing that one step in a prior act process otherwise distinct.").

move ionic impurities, and that by passing a liquid through *both* a cation and an anion resin, one could remove *both* cationic *and* anionic carbon contaminants. *See* Hassler; Hedge.

Although Houghton, Bechtel, Martinola, Hegde, and Hassler together describe each element of the process, the *Mobile Water* court concluded that a person of modest skill would not have understood the suggestion to *combine* these elements. 690 F.Supp. at 786. Accepting this conclusion, this Court must deny Edison's motion, unless prior art presented to this Court is *more* suggestive than that presented in *Mobile Water.*

The *Mobile Water* court focused on Martinola and Bechtel, noting that "[n]othing in the Martinola reference . . . teaches the use of an . . . ion exchange resin following the hydrazine/carbon process." *Mobile Water,* 690 F.Supp. at 782. The Bechtel publication, on the other hand, "refer[s] to the use of ion-exchange resins in the secondary system of the power generating plant," *Mobile Water,* 690 F.Supp. at 782, and thus might suggest the combination to one expert in the art. *Id.* at 786. However, any suggestion to make the combination is quite subtle, and obscured by Bechtel's dense, challenging prose. While an expert, reading Bechtel, might make the connection, one of modest skill in the art would not. *Mobile Water,* 690 F.Supp. at 786.

In contrast, Demmitt suggests the combination clearly. In straightforward prose and a simple diagram, Demmitt suggests that adding an ion exchange resin to the end of the Houghton process will remove impurities in the effluent. Nevertheless, Ecolochem contends that Demmitt did not suggest the combination, emphasizing that Demmitt (1) focused on hydrazine removal, not carbon contaminants, (2) did not intend to use the resin as part of full-scale process, and (3)

only sent a portion of the effluent—the test stream—over the cation resin.

None of these factors would have obscured Demmitt's suggestion. In light of the extensive prior art, one of modest skill would have required only a suggestion to combine Houghton and an ion exchange resin to remove impurities [29]—the other prior art would have informed even one of modest skill that ion exchange resins would remove ionic carbon contaminants as well as hydrazine.[30] Similarly, a person of even modest skill would not have been distracted by Demmitt's scale or purpose. Demmitt's suggestion was clear: Use an ion exchange resin at the end of the Houghton process and your effluent will be more pure. *Cf.* Chisum § 5.04[5] (noting that courts often find inventions which are merely enlarged versions of previous inventions to be obvious).

■ Nevertheless, Ecolochem contends that even if this Court find Demmitt to be suggestive, "the secondary factors impel a conclusion that the '492 patent was not obvious." *Mobile Water,* 690 F.Supp. at 786 n. 9. This Court disagrees. Secondary considerations carry little weight where a critical prior art reference has long been neglected. *See Graham,* 383 U.S. at 36, 86 S.Ct. at 703 (declaring patent invalid as obvious notwithstanding alleged failure by others, noting that "[i]t is irrelevant that no one apparently chose to avail himself of knowledge stored in the patent office and readily available.").[31] In the instant case, the person of ordinary skill in the industry does not possess a broad knowledge of developments in the art. *Mobile Water,* 690 F.Supp. at 784 ("Likewise, the experts, (presumably persons who would be included among the most highly skilled in the art) who were called at trial were unaware of the Houghton process until retained by the parties in this litigation."). Moreover, Ecolochem concedes, and indeed even em-

---

29. The '411 patent itself grouped carbon contaminants and excess hydrazine together as "impurities." '411 patent col. 1.

30. Although Demmitt used a cation exchange resin, instead of a mixed bed or both cation and anion exchange resins, the prior art suggested which type of resin to use.

31. *See also Manufacturers Sys., Inc. v. ADM Indus., Inc.,* 198 U.S.P.Q. 223, 1978 WL 21428 (N.D.Ind.1978), *aff'd,* 615 F.2d 741 (7th Cir. 1979); Chisum, § 5.04[1] ("[T]he presumption [of perfect knowledge of prior art] dilutes . . . evidence of prior failures in the art—since [such failures] are often predicated on less-than-perfect knowledge of the prior art.").

phasizes, that no one in the art searching for a solution to the deoxygenation problem found Demmitt. Rather than indicate that the invention is non-obvious, the secondary considerations merely reemphasize that no one consulted Demmitt. In short, the industry may not have been so much in need of improved inventions, as it was in need of better research.

Unfortunately for Ecolochem, "[i]n order to discourage wasteful or duplicative original inventive activity, the patent laws impose an absolute duty to research the entire pertinent prior art for a solution to a problem at hand." Chisum § 5.04[1]. Ecolochem's evidence of secondary considerations, therefore, does not outweigh Demmitt and render the claims non-obvious. *Foster*, 22 U.S.P.Q.2d at 1357, 1991 WL 340568. Edison has overcome the presumption of validity by clear and convincing evidence, and has proven that a person of modest skill in the art, armed with Demmitt and the other prior art references, would have found '411 claim 20 obvious.[32]

*'492 Claims 7 and 10.* Because '411 claim 20 is obvious in light of Demmitt, '492 claims 7 and 10 are clearly obvious as well. '492 claim 7 depends on claim 6, which the Demmitt reference anticipates, and adds only a "final step of circulating said deoxygenated water at elevated temperatures in a power-generating apparatus." '492 col. 8:31–33. Similarly, claim 10 depends on claim 9, which Demmitt also anticipates; claim 10 adds only a "final step of circulating said deoxygenated water at elevated temperatures in a power-generating apparatus." '492 col. 8:46–48.

The prior art clearly suggests using a deoxygenated stream in a power generator. (*See* Demmitt at 2; '411 File Wrapper at 4 publication.). Keeping in mind that claims must be considered as a whole, this Court finds that '492 claims 7 and 10 are invalid as obvious.

---

**32.** This Court has reviewed Rice's declaration, which states that the claims are not obvious. However, "an expert's opinion on the legal conclusion of obviousness is neither necessary or controlling." *Avia Group Int'l v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1564 (Fed.Cir.1988).

### III. *Summary*

Ecolochem's effort may have benefitted society and the power generation industry. A seventeen-year monopoly, however, is too high a price to pay for an invention which would have been obvious to anyone availing themselves to the full scope of the prior art. *See Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532, 1537–38, 47 L.Ed.2d 784 (1976) ("Though doubtless a matter of great convenience, producing a desired result in a cheaper and faster way, and enjoying commercial success, [the invention] did not produce a 'new or different function' . . . within the test of validity of combination patents."). Therefore, this Court finds as follows:

1. The meaning of "deoxygenation process" presents a genuine issue of material fact precluding summary judgment of non-infringement of all claims.

2. Edison has presented clear and convincing evidence that the Demmitt reference was sufficiently accessible for § 102 and § 103 purposes.

3. Ecolochem's evidence of unsuccessful searches, though relevant, is inadmissible under F.R.Evid. 403.

4. Demmitt anticipates claims 8 and 9 of the '492 patent and claim 21 of the '411 patent.

5. Although Demmitt does not teach the use of a mixed bed, it indisputably discloses the use of a cation resin. Thus, Demmitt anticipates '492 claims 1, 5, and 6.

6. At best, Edison offers only thin evidence that Demmitt reaches hydrazine levels of less than 1 ppb. A reasonable trier of fact would not necessarily find this evidence clear and convincing— thus, whether Demmitt in fact reaches these hydrazine levels is a genuine issue of material fact precluding summary judgment of invalidity due to anticipation on '492 claims 15 and 16.

7. Demmitt anticipates '492 claim 2.

*See also Nutrition 21 v. United States*, 930 F.2d 867, 871 n. 2 (Fed.Cir.1991). Thus, such declarations do not preclude summary judgment. *Cable Electric. Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1025 (Fed.Cir.1985).

8. The prior art renders '411 claim 20, and '492 claims 7 and 10 invalid as obvious.

**IT IS SO ORDERED.**